

1  **BARRY R. GORE, ESQ. SBN 143278**
   **CHRISTINE M. FITZGERALD, ESQ. SBN 259014**
2  **SMITH | CAMPBELL | CLIFFORD | KEARNEY | GORE**
   **A Professional Law Corporation**
3  **3424 Carson Street, Suite 350**
   **Torrance, California 90503**
4  **(310) 542-0111 Telephone**
   **(310) 214-7254 Facsimile**
5
   Attorneys for Secured Creditor CCRC
6  Farms, LLC

7

8                **UNITED STATES BANKRUPTCY COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10                       **SANTA ANA DIVISION**

11  In re:                          Case No. 8:09-bk-16774 TA

12                                   Chapter 11
    CARL H. REINHART,
13

14                                   **OBJECTION OF CRCC FARMS, LLC TO**
                                     **ORIGINAL SECOND AMENDED**
15                                   **DISCLOSURE STATEMENT OF**
                                     **DEBTOR, CARL H REINHART,**
16                                   **DESCRIBING CHAPTER 11 PLAN**
                                     **DATED 01/21/2011; DECLARATION OF**
17                                   **JAMES A. BARRETT, JR. IN SUPPORT**
                                     **THEREOF**
18           Debtor and Debtor in
             Possession.
19                                   **Hearing**
20                                   Date:        March 2, 2011
                                     Time:        10:00 a.m.
21                                   Place:       Courtroom 5B
                                     Before:      Judge Theodor C. Albert
22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................... 1

II.  BACKGROUND .......................................................................................... 2

    A.  Factual Background ...................................................................... 2-4

    B.  Amount of CCRC's Secured Claim as of January 31, 2011
       and Property Taxes ........................................................................ 4-5

    C.  Reinhart's Second Amended Plan and Disclosure
       Statement and Treatment of CCRC's Secured Claim ...................... 5-7

    D.  Reinhart's Valuation of and Business Plan for the Property ............. 7-8

III.  ANALYSIS ................................................................................................ 8

    A.  The Court Should Not Approve the Disclosure Statement
       Because the Plan is Not Feasible and Therefore Cannot Be
       Confirmed .................................................................................. 8-10

    B.  The Disclosure Statement Does Not Contain "Adequate
       Information" As Required By Section 1125 ................................ 10-13

    C.  The Plan prematurely provides for discharge of Debtor on
       the Effective Date rather than after all payments have been
       made .......................................................................................... 13

    D.  The Plan prematurely provides for a release of Debtor and
       his agents as of the Effective Date rather than after all
       payments have been made. ............................................................ 13

    E.  The Plan does not provide fair and equitable treatment of
       CCRC ...................................................................................... 14-16

IV.  CONCLUSION ........................................................................................ 17

# TABLE OF AUTHORITIES

## Cases

**Page(s)**

*In re Moorpark Adventure,* 161 B.R. 254,256-258 (Bankr. C.D. Cal. 1993) .................................................................................................8

*In re In Re Felicity Assocs, Inc.,* 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ................8

*In re Market Square Inn, Inc.,* 163 B.R. 13 64, 68 (Bankr. W.D.Pa. 1994) .................................................................................................8

*In re Felicity Assocs., Inc.,* 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ..........................8

*Mutual Life Ins. Co. v. Patrician St. Joseph Partners, Ltd. Partnership (In re Patrician St. Joseph Partners Ltd. Partnership),* 169 B.R. 669, 676 (D. Ariz. 1994).................................................................. 9,16

*In re Kemp,* 134 B.R. 413, 416 (Bankr. E.D. Cal. 1991)...........................................9

*In re Unichem Corp.,* 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987)............................... 10

*In re Beltrami Enters, Inc.,,* 3 B.R. 303, 304 (Bankr. M.D. Pa. 1995).................. 10

*In re Pac. Gas & Elec. Co.,* 273 B.R. 795, 808 (Bankr. N.D. Cal. 2002), *rev'd* 350 F.3d 932 (9th Cir. 2003)....................................... 10

*In re Diversified Investors Fund XVII,* 91 B.R. 559, 561 (Bankr. C.D. 1988) ...................................................................................... 10,13

*In re Scioto Valley Mortgage Co.,* 99 B.R. 168 (Bankr. E.D. Ohio 1988) .................................................................................................10

*Scioto Valley,* 99 B.R. 168,171-172.............................................................. 11, 12

*In Re Reilly,* 71 B.R. 132, 135 (Bania D. Mont. 1987)......................................... 12

*In re Love-Seemann Properties,* 49 B.R. 770, 772 (Bankr. D. Haw. 1985) .................................................................................................12

*Metropolitan Life Ins. Co. v. Murel Holding Corp. (In Re Murel Holding Corp.),* 75 F.2d 941, 942 (2d Cir. 1935) ...................................... 15

*In re Arnold & Baker Farms,* 85 F.3d 1415, 1421 (9th Cir. 1996) ........................ 15

*In re Walat Farms, Inc.,,* 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987)................. 15

*In re Orchards Vill. Inv.,,* 2010 B.R. LEXIS 48, 50-53 (Bankr. E.D. Mich. 1987).................................................................................... 15

*In re Federal Land Bank of Louiseville v. Gene Dunavant and Son Dairy,* 75 B.R. 328, 335-336 (U.S.D.C. M.D. Tenn. 1987) ........................ 16

*In re Edgewater Motel, Inc.,* 85 B.R. 989, 995 (Bankr. E.D. Tenn. 1988) ................................................................................................... 16

## **Statutes**

11 U.S.C. § 1129 (a)(11) ........................................................................ - 8 -

11 U.S.C. § 1125(b) ..............................................................................- 10 -

11 U.S.C. § 1129(a)(2) ..........................................................................- 11 -

11 U.S.C. § 1129(a)(3) ..........................................................................- 12 -

11 U.S.C. § 1141(d)(5)(A) ....................................................................- 13 -

11 U.S.C. § 1129(b) ..............................................................................- 14 -

Section 1129(b)(2)(A)(ii) ......................................................................- 14 -

11 U.S.C. § 1123(a)(5)(G) ....................................................................- 16 -

## II.    BACKGROUND

### A.    Factual Background

In the DS, the Debtor is generally correct, but slightly vague, in his description of CCRC's secured claim ("Secured Claim"), and the treatment of that Secured Claim under the Plan.

CCRC holds a Note from Reinhart in the original principal amount of $600,000, which is secured by a First Deed of Trust on real property generally described as the Silverado Center in Silverado Canyon, CA (the "Property"). As of January 31, 2011, Reinhart owes CCRC in excess of **$627,008.02** on the Note (including principal and interest but not attorneys' fees).

The specifics are as follows:

In February 2006, CCRC sold the Property to Reinhart for $725,000. The Property is located at 28192-28222 Silverado Canyon Road, and is comprised of four parcels (APN nos. 873-033-02; 873-033-03; 873-033-04; and 873-033-05). In the DS and Plan, the Property is referred to as Properties 3, 4, 5, and 6. As part of the sale, CCRC took back a Note from Reinhart in the original principal amount of $600,000, secured by a First Trust Deed on the Property. True and correct copies of CCRC's Note ("Note") and First Trust Deed ("Trust Deed") are attached hereto as Exhibit "A."[2]   The Note provides for non-default interest at 7%, with monthly p&i payments amortized over 20 years in the amount of approximately $4,651.79, but with the entire balance due and payable after three years, on March 3, 2009.

Reinhart made all payments under the Note from 2006 through August 2008; then Reinhart paid CCRC additional lump sums of $13,153.40 in December 2008, $13,153.40 in May 2009, and $3,288.35 in June 2009; this was Reinhart's last payment prior to his filing of this case. Reinhart states in his schedules, and in the DS and Plan, that the principal amount owing to CCRC as of the Petition Date (July 7, 2009) was $570,000.

In 2009, Reinhart made a proposal to CCRC to extend the due date on the Note for a year, in exchange for interest only monthly payments of $3,351.44. As part of this offer, Reinhart agreed to give CCRC a deed in lieu of foreclosure should he default. While documents evidencing

---

[2]   Based on the Plan and DS, it appears that Reinhart, after 2006, further encumbered the Property with second, third, and possibly fourth trust deeds, all of which add up to considerable additional secured debt on the Property.

OBJECTION OF CRCC FARMS, LLC TO ORIGINAL SECOND AMENDED
DISCLOSURE STATEMENT OF DEBTOR

1   this re-negotiation were drafted, they were never signed, due to Reinhart's bankruptcy filing on

2   July 7, 2009.

3         On July 7, 2009 (the "Petition Date"), Reinhart filed his bankruptcy petition.  It appears the

4   bankruptcy was filed to stop a foreclosure by a construction lender on a spec home that Reinhart

5   was building on a 92 acre parcel located on Ladd Canyon Road in Silverado, California (the

6   "LADD Property").

7         CCRC is informed that Reinhart, since filing bankruptcy, has segregated, and accounted

8   for, all rents collected at the Property.  The rents are subject to CCRC's First Trust Deed and,

9   therefore, are "cash collateral" and property of CCRC.  As of February 14, 2011, Reinhart had

10  turned over to CCRC $53,040.35 in rents collected by him at the Property, and his most recent

11  monthly operating report [Docket No. 124] indicates that there currently is less than $1,100 in

12  cash collateral being held by the Debtor related to the Property.

13        In October 2009, this Court held a status conference and ordered Reinhart to file his

14  proposed plan of reorganization by March 2010.  Reinhart filed his original bankruptcy plan and

15  disclosure statement on March 22, 2010.

16        On June 8, 2010, Reinhart filed his first amended plan and second amended disclosure

17  statement.  The hearing on that disclosure statement was continued after Commercial Bank of

18  California ("CBC") filed a motion for valuation of the LADD Property, which is a key component

19  of the Plan.

20        CCRC did not file any objection to Debtor's original or first amended plans and disclosure

21  statements because CCRC believed it had negotiated a consensual resolution of its issues with

22  Reinhart and that the parties merely needed to document that settlement in a stipulation.  No such

23  stipulation was ever signed.

24        In its order on CBC's motion to value the LADD Property, this Court valued the undivided

25  LADD Property with the residence on it, as-is, at $3,415,000, and the Court concluded that if

26  $1,200,000 were invested into completion of the residence, after completion, the as-is value would

27  be $4,615,000.  DS at p. 10, lines 2-7.  This was significantly below Reinhart's estimated value,

28  and Reinhart – in spite of the Court's ruling on this exact issue – still contends that the fair market

1  value of the LADD Property "will be at least $7,500,000, although REINHART understands this

2  Court's opinion of such value would only be $4,615,000." DS at p. 25, lines 25-27.

3      CCRC believes Reinhart has similarly overestimated the value of the Property, which he

4  contends is worth $2,000,000, as explained below. CCRC recently obtained a broker's opinion of

5  value ("BOV") from Edward O'Donnell, Broker's License # 00840738; a true and correct copy of

6  the BOV is attached hereto as Exhibit "B." Mr. O'Donnell concludes in the BOV that the

7  Property's value is only $790,000.

8      On December 30, 2010, CBC filed a motion for conversion or dismissal of this case

9  [Docket No. 108] ("Motion to Convert") because, among other things, Reinhart had not filed a

10  new plan and disclosure statement as ordered by the Court.

11      Apparently in response to the Motion to Convert, on January 21, 2011, Reinhart filed his

12  second amended plan (the "Plan") and second amended disclosure statement (the "DS").

13      The hearing on whether to approve the disclosure statement is set for March 2, 2011.

14      **B.**      **Amount of CCRC's Secured Claim as of January 31, 2011 and Property Taxes**

15      The Note provides for interest at the rate of 7% plus 5% of each payment that is paid after

16  the 15th of the relevant month, and the Note provides for interest to accrue on unpaid interest. See

17  Exhibit A at p. 1. CCRC calculates that, as of **January 31, 2011**, the total amount owing on the

18  Note is **$588,813.05**, not including attorneys' fees and costs.

19      CCRC's attorneys' fees and costs in this matter, which are also recoverable under the

20  Note, exceed $50,000 from July 2009 through January 2011.

21      Thus, as of January 31, 2011, CCRC's total claim was $638,813.05 , it has increased since

22  then as a result of attorneys' fees and accrual of additional interest on unpaid amounts, and it will

23  increase as additional interest, attorneys' fees and costs accrue and are incurred in the future.[3]

24

25

_____

26  [3]  CCRC believes this calculation is accurate and reserves all rights to seek all interest, fees,
    charges and other costs that are appropriate. In particular, much of the work in opposing the
27  DS has been done since January 31, 2011 because CCRC had attempted to negotiate a
    resolution of these issues but was not successful. Attorneys' fees through January 31, 2011 are
28  over an 18 month period, and counsel has requested information on these from CCRC's prior
    counsel, Irell & Manella LLP.

1    In addition, Debtor has also vastly understated the actual unpaid property taxes for all of

2    the 8 properties listed in the Plan, which he says totals $75,000.  DS at p. 22, lines 2-3.  From the

3    public website of the Orange County Assessor, the property taxes on the Property alone will

4    exceed $100,000 in April 2011, when the next installment of property taxes is due.  Attached as

5    Exhibit "C" is a true and correct copy of that website listing the taxes owing for the Property.

6    Since the property taxes will be paid prior to payment to CCRC upon sale of the Property,

7    the total equity allocated to property taxes and CCRC's claim to date is thus at least $738,813.05.

8    **C.**    **Reinhart's Second Amended Plan and Disclosure Statement and Treatment of**

9    **CCRC's Secured Claim**

10    Reinhart's Plan appears to have two central components, one of which is related to the

11    LADD Property, and the other of which relates to the Property that secures the Note to CCRC.

12    **1.**    **THE LADD PROPERTY.**  Reinhart has filed a motion to approve additional

13    financing on the LADD Property up to $1,200,000 [Docket No. 113].  With this financing,

14    Reinhart states that he believes he will be able to develop and sell the LADD Property, with the

15    alleged result of millions of dollars in profits and additional value being available to Reinhart's

16    unsecured creditors.  However, the Court has determined that Reinhart's valuation of the LADD

17    Property was excessive, as noted above, even if such improvements are made.

18    The LADD Property is the driving component of the bankruptcy.  Without the business

19    plan related to the LADD Property that Reinhart has proposed, the bankruptcy appears to make

20    little sense.  If Reinhart does not obtain financing on the LADD Property, his bankruptcy case will

21    probably convert to a chapter 7.  In that event, CCRC should be immediately granted relief from

22    stay to foreclose on the Property.

23    **2.**    **THE "CCRC" PROPERTY.**  Under the Plan, Debtor proposes the following with

24    respect to CCRC's Secured Note:

25    (a)    On the Effective Date of the Plan, the Debtor proposes the following treatment of

26    CCRC's claim:

27    x. **Principal Amount**: The CCRC Note shall have a principal amount of

28    $570,000.

y. **Interest**: The pre-petition and post-petition interest that will accrue and has accrued on the above Principal shall be calculated at the **non-default rate** set in the CCRC Note, or such other interest rate as shall be determined by the Court or as Debtor and CCRC may agree, and any accelerated interest rate shall be disallowed.

z. **Attorneys' Fees**: To the extent such fees and related costs are authorized under the CCRC Note, they shall be paid when the Principal is paid.

aa. **Payments/Maturity Date**: Unless otherwise agreed by Debtor and CCRC, or as determined by the Court, a single payment of Principal, Interest, and Attorneys' Fees shall be paid to CCRC from the sale of Property 3, 4, 5, or 6, whichever first occurs, but in no event shall this date be later than December 31, 2012. In addition, **on the Effective Date, any cash collateral remaining** in the Debtor in Possession account for Properties 3, 4, 5, and 6 **or paid during this case** to CCRC by REINHART **shall be applied to reduce the principal balance of the CCRC Note**. After the Effective Date, REINHART shall pay all post-operational net rental income from Properties 3, 4, 5, and 6 to CCRC until its Claim is paid in full.

DS at p. 27, lines 4-17 (**emphasis added**). Elsewhere, though, the Debtor makes it clear that he wants to keep the vacant lots that are part of the Property and that he asserts that the loans secured by the Property will "be paid in full from the sale of Property No. 4 and Property No. 5 . . . ." DS at p. 12, lines 14-16.

"The Effective Date of the Plan will be 30 calendar days after the entry of an Order confirming the Plan." DS at p. 5, lines 21-22. Thus, the Effective Date could occur in the next 1-3 months of 2011.

The negative implications of this treatment of the Secured Claim are that Debtor proposes:

A.    to deny compounding of interest and default interest in the form of the 5% charge on late payments from the Petition Date through the Effective Date, even though the Debtor concedes that CCRC is fully secured and the Note provides for such amounts while in default, and

B.    to apply all cash collateral that Debtor has paid and might hereafter pay CCRC to **principal**, rather than interest, effective on the Effective Date.

(b)    The Debtor represents that he is currently marketing the Property (or certain parcels in the Property) for sale, and will continue to collect rents. The Debtor proposes that he have the next 20 months – that is more than 1.5 years – until **September 30, 2012**, to sell the Property. CCRC objects to such an extended period of time. Debtor has been marketing this portion of the

1  Property for $1.75 million for more than 200 days without any offer, and during any additional

2  time given to Debtor, CCRC has no assurance of adequate protection or interim interest rate

3  payments on the Note, which was due and payable in full and which has been in default since

4  September 2008.

5       If Debtor is allowed to market the Property for another year and a half, CCRC's claim will

6  increase by unpaid interest, and property taxes will increase if they are not paid.  Further, Debtor's

7  proposed application of cash collateral on the Effective Date to principal would lower the amount

8  of interest that CCRC would receive if cash collateral were appropriately applied to interest

9  because interest on a higher principal amount will provide a larger amount than interest on a lower

10  amount. In addition, CCRC will be entitled to any and all additional attorneys' fees and costs

11  incurred in this matter.  Assuming for the sake of discussion that total attorneys' fees and costs

12  through September 30, 2012 are $70,000 and property taxes will be at least $22,000, CCRC

13  estimates that the amount owing to CCRC on the Note plus property taxes, as of September 30,

14  2012, would be over **$780,000**.  Given the BOV estimate of value of $790,000 and Debtor's

15  history of unrealistic valuations, CCRC is not adequately protected.

16      D.    **Reinhart's Valuation of and Business Plan for the Property**

17       As the Court is probably aware, on June 8, 2010, Reinhart filed his own broker's price

18  opinion ("BPO") of value for the Property.  Reinhart's BPO values the four parcels, of which the

19  Property is comprised, at **$2 million** in the aggregate.  However, Reinhart in his BPO also

20  concedes that: **"we believe that the liquidation value of the Property, based on an immediate**

21  **sale in as-is condition, closing in thirty days or less, is $1,100,000."**  BPO at 2.

22       Reinhart still maintains that his BPO of June 2010 is accurate, DS at p. 14, line 27 – p. 15,

23  line 1.  Reinhart's breakdown of his estimate of $2 million in value is as follows:

24      1.    The Canyon Market/Orange County Public Library Parcel; 2100 rentable square

25           feet.  Reinhart stated that he has placed this parcel on the market for sale for

26           $725,000.  He values the parcel at **$700,000**.

27      2.    The Restaurant Parcel; 3000 rentable square feet.  Currently vacant.  Reinhart

28           states that he intends to market this parcel for **$1,000,000**, which he estimates to

1    be its fair market value.  Reinhart has placed this parcel on the market for sale for

2    $1,050,000.

3    3.    The remaining two parcels are vacant land.  Reinhart states that he plans to hold

4    these for future development; he values these parcels at **$300,000**.

5    These values from July 2010 are at best stale and appear to be as pie-in-the-sky as his

6    overvaluation of the LADD Property.  The BPO obtained by CCRC recognizes that values in the

7    area have decreased to their 2006 levels – when Debtor purchased the Property at $725,000 – and

8    now the Property is worth $790,000.  CCRC's Secured Claim is rapidly approaching that amount

9    and needs to be adequately protected.

10    In addition, CCRC's secured interest in rents needs to be adequately protected with regard

11    to rents, which are cash collateral.  Debtor does not estimate how much will go to maintenance

12    and other expenses, which could be significant on these aging properties.

13               III.    **ANALYSIS**

14    A.    **The Court Should Not Approve the Disclosure Statement Because the Plan is**

15    **Not Feasible and Therefore Cannot Be Confirmed**

16    It is well established that courts may consider substantive plan issues at the disclosure

17    statement hearing and deny approval to a disclosure statement for a plan that cannot be confirmed

18    on its face.  *See, e.g. In re Moorpark Adventure,* 161 B.R. 254,256-258 (Bankr. C.D. Cal. 1993);

19    *see also In re Felicity Assocs., Inc.,* 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("it has become standard

20    Chapter 11 practice that when an objection raises substantive plan issues that are normally

21    addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation,

22    where the proposed plan is arguably unconfirmable on its face.") [internal citations omitted]; *In re*

23    *Market Square Inn, Inc.,* 163 B.R. 13 64, 68 (Bankr. W.D.Pa. 1994).

24    The proponent of a Chapter 11 plan must show that the plan "has a reasonable probability

25    of success:"

26    Section 1129(a)(11) of the United States Bankruptcy Code (the "Code") sets forth
the feasibility requirement and provides that a plan may be confirmed only if
confirmation "is not likely to be followed by the liquidation, or the need for

27    further financial reorganization, of the debtor or any successor to the debtor under
the plan, unless such liquidation or reorganization is proposed in the plan." 11

28    U.S.C. § 1129(a)(11).  A plan meets this feasibility standard if the plan offers a

1   reasonable prospect of success and is workable. 5 Collier on Bankruptcy §
    1129.02[11] (15th ed. 1992).
2
3   *Mutual Life Ins. Co. v. Patrician St. Joseph Partners, Ltd. Partnership (In re Patrician St. Joseph*

    *Partners Ltd. Partnership),* 169 B.R. 669, 674 (D. Ariz. 1994).
4
5       In determining whether a plan is "feasible" within the meaning of § 1129(a)(11), courts

    have identified the following factors to be considered:
6
7           the prospective earnings of the business or its earning power; the soundness and
            adequacy of the capital structure and working capital for the business which the
            debtor will engage in post-confirmation; the prospective availability of credit;
8           whether the debtor will have the ability to meet its requirements for capital
            expenditures; economic and market conditions; the ability of management, and
9           the likelihood that the same management will continue; and any other related
            factors which would materially reflect on the company's ability to operate
10          successfully and implement its plan."

11  *In re Kemp,* 134 B.R. 413, 416 (Bankr. E.D. Cal. 1991) (quoting *In re Texaco, Inc.,* 84 Bankr. 893,

12  910 (Bankr. S.D.N.Y. 1988)).

13      As noted, Debtor continues to argue the LADD Property being worth millions of dollars

14  more than this Court determined shortly before the DS was filed. The LADD property was valued

15  by this Court as of at $3,415,000 with improvements increasing value dollar for dollar, so

16  improvements will not increase funds available for creditors. The DS indicates Debtor intends to

17  pursue the filing of a tentative map with the County of Orange (DS at p. 11, lines 16-17) but is

18  silent as to the time, expense and feasibility of such a property division. The DS is similarly silent

19  as to what factors have been considered and whether or not the LADD Property is even capable of

20  subdivision at all. Thus, the Plan and Debtor's intentions thus appear to constitute mere

21  speculation – a "visionary scheme" – as to whether the LADD Property may be subdivided and

22  what the future market value will be. Because the LADD Property apparently constitutes a

23  substantial portion of the estate and the Plan apparently requires subdivisions of the LADD

24  Property to succeed, the Plan as a whole is not feasible.

25      In addition, Debtor tries to avoid the requirement that administrative claims are to be paid

26  on the Effective Date by stating that his counsel has agreed to paid its $30,000 to $50,000 in fees

27  later, but even so, he does not adequately explain where the funds will come from. Debtor states,

28  "Debtor expects to have no less than $** ,000 [sic] in unencumbered cash on hand on the

- 9 -

Effective Date of the Plan. The source of the funds to pay such claims will be the net proceeds of sale of real properties or operations of same, or REINHART's own personal service income from Peninsula." DS at p. 20, lines 6-12. However, from his most recent operating statement, Debtor only netted about $1,100 for one month. It is clear that the LADD Property will not be sold until after repairs and there has been no interest in the parcels of the Property that Debtor has listed for sale. The Plan is also not feasible for this reason.

**B.    The Disclosure Statement Does Not Contain "Adequate Information" As Required By Section 1125**

Section 1125 requires that prior to the solicitation of acceptances of a plan of reorganization, each impaired claimant and interest holder must receive a disclosure statement that has been previously approved by the court as containing "adequate information." 11 U.S.C. § 1125(b). "Adequate information" is defined as:

> "[I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan ... " [11 U.S.C. § 1125(a)(I).] The purpose of a disclosure statement is to provide sufficient information so that a typical investor can make an informed judgment whether to vote for or against the plan.

*In re Unichem Corp.,* 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987). The disclosure statement must describe all factors known to the plan proponent that may impact the success or failure of the proposals contained in the plan. *See, e.g., In re Beltrami Enters., Inc.,* 3 B.R. 303, 304 (Bankr. M.D. Pa. 1995).

Several courts have articulated lists of the kinds of information that should be included in a disclosure statement. *In re Pac. Gas & Elec. Co.,* 273 B.R. 795, 808 (Bankr. N.D. Cal. 2002), *rev'd,* 350 F.3d 932 (9th Cir. 2003); *In re Diversified Investors Fund XVII,* 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) (disclosure statement must contain liquidation analysis); *In re Scioto Valley Mortgage Co.,* 99 B.R. 168 (Bankr. E.D. Ohio 1988). Among the required disclosure subjects are:

(1) the accounting and valuation methods used to produce the financial information in the disclosure statement; (2) the compensation to be paid to any insiders, directors and/or

officers of the Debtor; (3) detailed information about the Debtor's ability to make the payments proposed in the plan; (4) an estimate of all administrative expenses, including attorneys' fees and accOlmting fees; (5) the collectability of any accounts receivable; (6) any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan; (7) the actual or projected value that can be obtained from avoidable transfers; (8) the existence, likelihood, and possible success of no bankruptcy litigation; and (9) the relationship of the Debtor with affiliates.

*Scioto*, 99 B.R. at 171-72. If a disclosure statement does not contain adequate information for purposes of Section 1125, then the plan it describes is not eligible for confirmation pursuant to section 1129(a)(2) of the Bankruptcy Code.

As more fully set forth below, the DS fails to satisfy the minimum disclosure requirements of Section 1125. Because the DS does not provide creditors with "adequate information", which would enable them to make an informed judgment about the Plan, approval should be denied.

**1. The Disclosure Statement Lacks Adequate Information Concerning Debtor's Ability to Make the Payments Proposed by the Plan and Fails to Disclose Insider Compensation**

As noted above, Debtor fails to explain how he will make the payments proposed by the Plan. According to his most recent monthly operating report [Docket No. 124], Debtor has shown that in the past year and 9 months since the Petition Date, he has cumulatively lost over $844,000. For December 2010, Debtor only shows a cumulative net income of just over $1,000 for the month, which CCRC believes is basically consistent with prior months. This is hardly sufficient to make the payments contemplated by the Plan.

In addition, although the debtor disclaims any compensation for acting as disbursing agent and seeks to serve as such without bond (DS at p. 43), the DS is silent as to what compensation Debtor will receive, other than the real properties he intends to keep (while CCRC and other secured creditors receive less than the full amount of their claims, as explained below).

**2. The Disclosure Statement Lacks Adequate Information Concerning the Accounting and Valuation Methods Used in the Preparation of the Disclosure Statement**

1    *In re Scioto Valley* lists as one category of required disclosures, "any financial information,

2    valuations or pro forma projections that would be relevant to creditors' determination of whether

3    to accept or reject the plan." *Scioto Valley,* 99 B.R. 168.  Courts have denied the approval of

4    disclosure statements where real property valuations lack factual basis. *In re Reilly,* 71 B.R.

5    132,135 (Bania. D. Mont. 1987).

6        Here, Debtor refers to his Schedule B for the value of "Current Assets", DS at p. 54, lines

7    1-2, which includes only personal property; presumably he meant also to include the estate's real

8    property holdings, which his Schedules – which have not been updated since the Court's recent

9    valuation of the LADD Property – still include a lump sum of over $9,000,000 (Summary of

10   Schedules).  There is no information concerning the process Debtor used in arriving at these

11   values, except Debtor's reliance on his own BPO of the values of the Property from more than 6

12   months ago – which CCRC's BOV refutes (Exhibit B) – and his own BPO of the LADD Property,

13   which Debtor continues to argue is worth much more than the Court's determination of value of

14   $3,415,000.  The DS should only rely on current information on the value of the Property and the

15   LADD Property, not Debtor's BPOs from July 2010.  *See In re Love-Seemann Properties,* 49 B.R.

16   770, 772 (Bankr. D. Haw. 1985) (Court found a lack of good faith under Section 1129(a)(3) in

17   proposing a plan because, among other things "[i]nstead of seeking merely a fresh-start, the

18   Debtor's plan of reorganization seeks to market the subject property at $2.6 to $2.9 million, at a

19   price which is higher than its own witnesses' opinion of the market value of the property.").

20       Without accurate, current information, the feasibility of the Plan cannot be determined.

21   **3. The Disclosure Statement Lacks Adequate Information Concerning the Treatment
     of Creditors' Claims Under a Hypothetical Chapter 7 Case**

22

23       For the Liquidation Analysis under Chapter 7, the Debtor simply states – without analysis –

24   that creditors "REINHART is proposing a Plan that will pay all at least 105% of their allowed

25   claims. REINHART maintains that this requirement is met here for the following reasons:

26   REINHART is proposing a Plan that will pay all at least 105% of their allowed claims.  If the case

27   were converted and a Chapter 7 Trustee administered the estate's assets, REINHART estimates

28   that all creditors would receive no better treatment." DS at p. 48, lines 24-28.

-----

- 12 -

1  Debtor does suggest that more information is available in Exhibit E, which is "Filed

2  Separately with this Disclosure Statement," DS at p. 54, lines 11-12, but the DS does not appear to

3  include a separate Exhibit E, and the docket does not indicate that any such document was filed

4  separately.  This lack of liquidation analysis is fatal to the DS.  *In re Diversified Investors Fund*

5  *XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) (disclosure statement must contain liquidation

6  analysis).

7  In addition, and more importantly, in Chapter 7, CRCC's claim would be calculated under

8  the terms of the CRCC Note, as explained in detail below, and that would result in CCRC

9  receiving (significantly) more in a liquidation than under the Plan.

10  **C.**    **The Plan prematurely provides for discharge of Debtor on the Effective Date**

11  **rather than after all payments have been made.**

12  The Plan provides, "The discharge of the Debtor shall be effective on the Effective Date of

13  the Confirmation Order . . . ."  DS at p. 50, lines 11-15.  Section 1141(d)(5)(A) provides that in an

14  individual debtor's case "unless after notice and a hearing the court orders otherwise for cause,

15  confirmation of the plan does not discharge any debt provided for in the plan until the court grants

16  a discharge on completion of all payments under the plan. . . ." 11 U.S.C. § 1141(d)(5)(A).

17  **D.**    **The Plan prematurely provides for a release of Debtor and his agents as of the**

18  **Effective Date rather than after all payments have been made.**

19  The Plan basically provides that upon the occurrence of the Effective Date, the Debtor and

20  its agents and professionals "shall be deemed to have no liability for any act or omission following

21  the Petition Date" in connection this case (DS at p. 51, lines 8-13), and then it purports to limit

22  that release by stating, "[n]othing in this section shall be construed to release or exculpate any

23  entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, ultra vires

24  acts or to discharge the Debtor prior to the receipt of its discharge pursuant to the Plan."  DS at p.

25  51, lines 13-17.  However, as noted above, the Plan would discharge Debtor on the Effective Date,

26  so these releases would be effective on the Effective Date and would apply to conduct after the

27  Effective Date.  Therefore, this release is misleading and unfair to creditors.

28

E.    **The Plan does not provide fair and equitable treatment of CCRC.**

Pursuant to Section 1129(b)(2), like all creditors, CCRC must receive "fair and equitable" treatment of its Secured Claim on the Effective Date:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling **at least the allowed amount of such claim, of a value, as of the effective date of the plan**, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b). The Plan provides for sale of a portion of the Property, and any such sale will occur after the Effective Date, so under Section 1129(b)(2)(A)(ii), so the sale must meet one of the other requirements as well (i.e., (i) or (iii)).

Section 1129(b)(2)(A)(ii) would require that CCRC receive on account of its Secured Claim "deferred cash payments totaling **at least the allowed amount of such claim, of a value, as of the effective date of the plan**, of at least the value of such holder's interest in the estate's interest in such property." The Plan fails this test because it only provides for interest on the principal minus cash collateral as of the Effective Date, and that amount is lower than the present value of CCRC's Secured Claim on the Effective Date because cash collateral received by CCRC should apply to unpaid interest, not principal.

The Plan also fails the test under Section 1129(b)(2)(A)(ii), which requires that a plan provide for the realization by CCRC of the "indubitable equivalent" of its Secured Claim:

- 14 -

The concept of "indubitable equivalence" comes from the decision written by Judge Learned Hand in *Metropolitan Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, 75 F.2d 941, 942 (2d Cir. 1935):

> [P]ayment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears for the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most *indubitable equivalence.* (Emphasis added.)

The Ninth Circuit approved the following analysis of "indubitable equivalence" in *Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1421 (9th Cir. 1996):

> [N]o matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such as would permit us to hold that the value of the land being offered is the indubitable equivalent of [the mortgagee]'s claim. "Indubitable" means "too evident to be doubted." Webster's Ninth New Collegiate Dictionary (1985). We profess doubt on the facts of this case.

(quoting *In re Walat Farms, Inc.*, 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987)).

> Under the TIC Plan, the NSA allowed secured claim is to be paid at a below market rate of interest (as discussed in greater detail below) over a term of seven years, with a substantial balloon payment due at the end of seven years, with prospects for refinancing unclear. I find that the treatment of NSA's secured claim under the TIC Plan is not its indubitable equivalent.

*In re Orchards Vill. Invs.*, 2010 Bankr. LEXIS 48, 50-53 (Bankr. D. Or. Jan. 8, 2010).

Here, the Note had a term of 3 years, which was to end in March 2009, and the Debtor proposes to market just two parcels of the Property for another year and a half if Debtor does not receive his price, which is considerably more than the value in the BOV obtained by CCRC; also, the rents are insufficient to provide adequate protection of CCRC's interests. This is not the indubitable equivalent of CCRC's Secured Claim on the Effective Date.

In sum, the Plan's computation of CCRC's claim, though vague, fails because it does not give CCRC compounded interest (i.e., interest on unpaid interest per the Note) plus 5% of missed payments.[4]  CCRC is entitled to these amounts because, if confirmed (though it should not be), the Plan will only purport to cure defaults under the Note on the Effective Date:

---

[4] The Note provides for 5% of each missed payment to be added to the amount owing under the Note. CCRC believes that these amounts constitute interest. To the extent that these amounts are not interest, Debtor improperly proposes to lower CCRC's claim by not including these amounts in the calculation of CCRC's claim as of the Effective Date.

1

2  In determining the allowed amount of the claim of a fully-secured creditor, the creditor is
   entitled to his contract rate of interest up to the effective date of the plan by virtue of 11

3  U.S.C. § 506(b), . . . . But this rule has no application to the present value analysis required
   by § 1129, or to the interest payable on claims after the effective date of a plan. 3 Collier

4  on Bankruptcy (15th ed. 1985) para. 506.05 at 506-43. Federal Land Bank of Louisville v.
   Gene Dunavant and Son Dairy (In re Gene Dunavant and Son Dairy), 75 B.R. 328, 335-

5  336 (U.S.D.C. M.D. Tenn. 1987) (emphasis in original).

6  *In re Edgewater Motel, Inc.*, 85 B.R. 989, 995 (Bankr. E.D. Tenn. 1988).  The *Patrician St. Joseph*

7  *Court* confirmed this conclusion:

8  The Code broadly states that a Chapter 11 plan shall "provide adequate means for the
   plan's implementation, such as . . . curing or waiving of any default." 11 U.S.C. §

9  1123(a)(5)(G). In this case, that means curing the event that triggered the default and
   returning to pre-default conditions. This "curing" event occurred on March, 1993, when

10 Debtor brought current all past non-default interest due pursuant to the Stipulated Cash
   Collateral Order.  The difference between the non-default rate of interest (9.5%) and the

11 default rate of interest (15%) is 5.5%. Thus, MONY is entitled to additional interest at a
   default rate of 5.5% from July, 1992 (date of default) until March, 1993 (date of cure) in

12 the amount of $ 330,000.

13 *Mutual Life Ins. Co. v. Patrician St. Joseph Partners, Ltd. Partnership (In re Patrician St. Joseph*

14 *Partners Ltd. Partnership)*, 169 B.R. 669, 676 (D. Ariz. 1994).  Thus, the Plan fails because it

15 does not give CCRC the full amount of its claim under the Note through the Effective Date.

16      Finally, the Plan inappropriately allocates payments of cash collateral by Debtor to CCRC

17 – whether received by CCRC before or after the Effective Date – to principal, not interest, <u>on the</u>

18 <u>Effective Date</u>.  This unfairly lowers the amount of the interest to be received by CCRC after the

19 Effective Date by the amount of interest that would have accrued on the total amount of unpaid

20 principal on the Effective Date.  For instance, if the Effective Date were April 1, 2011, if the

21 payments recently made by Debtor that total approximately $52,000 were allocated to principal on

22 the Effective Date, and if the Property were sold on September 30, 2012, then CCRC would be

23 paid about $5,460[5] less in interest than if that amount of cash collateral ($52,000) were deducted

24 from outstanding interest.

25

26

27

28 _____
   [5]   Interest of 7% on $52,000 is $303.33 per month and $5,460.00 after 18 months.

1

IV.    CONCLUSION

2    Accordingly, CRCC respectfully requests that based upon the foregoing concerns of

3 feasibility of the Plan and lack of adequate information provided in the DS, the Court deny

4 approval of the proposed DS and grant such other relief that is just and proper.

5

6 Dated: February 16, 2011                    SMITH | CAMPBELL | CLIFFORD | KEARNEY |
                                             GORE, A Professional Law Corporation

7

8

9    By: *Christine M. Fitzgerald*

10                                            Barry R. Gore
                                             Christine M. Fitzgerald
11                                            Attorneys for Secured Creditor CCRC
                                             Farms, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -

## DECLARATION OF JAMES A. BARRETT, JR.

I, James A. Barrett, Jr., declare as follows:

1.     I am an authorized representative of CCRC Farms, LLC ("CCRC"). I am involved in the operations of CCRC. I have personal knowledge of the following, or have gained such knowledge from my review of the records of CCRC, which were obtained, created and maintained in the ordinary course of business, and if called as a witness, could and would competently testify thereto.

2.     I am personally familiar with the books and records of CCRC as they relate to the Debtor. I am informed and believe these books and records were made by the employees of CCRC or its agents who had a business duty to enter the records of CCRC accurately at or near the time of the event which they record such information, by or from information transmitted by someone with personal knowledge of the event or act. To the extent that information contained in the CCRC's books and records was computer-generated, the computers used by CCRC were generally accepted in CCRC's industry, were in good working order at all relevant times, and the computer operator possessed the knowledge and training to operate the computer correctly.

3.     I hereby submit this Declaration in support of the *Objection Of CCRC Farms, LLC To Original Second Amended Disclosure Statement Of Debtor, Carl H Reinhart, Describing Chapter 11 Plan Dated 01/21/2011* (the "Objection"). Capitalized terms that are not defined herein are defined in the Objection.

4.     CCRC holds a Note from Reinhart in the original principal amount of $600,000, which is secured by a First Deed of Trust on real property generally described as the Silverado Center in Silverado Canyon, CA (the "Property"). As of January 31, 2011, Reinhart owes CCRC in excess of **$588,813.05** on the Note (including principal and interest but not attorneys' fees).

5.     In February 2006, CCRC sold the Property to Reinhart for $725,000. The Property is located at 28192-28222 Silverado Canyon Road, and is comprised of four parcels (APN nos. 873-033-02; 873-033-03; 873-033-04; and 873-033-05). As part of the sale, CCRC took back a Note from Reinhart in the original principal amount of $600,000, secured by a First Trust Deed on

1    the Property.  True and correct copies of CCRC's Note ("Note") and First Trust Deed ("Trust

2    Deed") are attached hereto as Exhibit "A."

3        6.        Reinhart made all payments under the Note from 2006 through August 2008; then

4    Reinhart paid CCRC additional lump sums of $13,153.40 in December 2008, $13,153.40 in May

5    2009, and $3,288.35 in June 2009.  Reinhart states in his schedules, and in the DS and Plan, that

6    the principal amount owing to CCRC as of the Petition Date (July 7, 2009) was $570,000.

7        7.        In 2009, Reinhart made a proposal to CCRC to extend the due date on the Note for

8    a year, in exchange for interest only monthly payments of $3,351.44.  As part of this offer,

9    Reinhart agreed to give CCRC a deed in lieu of foreclosure should he default.  While documents

10   evidencing this re-negotiation were drafted, they were never signed, due to Reinhart's bankruptcy

11   filing on July 7, 2009 (the "Petition Date").

12       8.        It appears the bankruptcy was filed to stop a foreclosure by a construction lender on

13   a spec home that Reinhart was building on a 92 acre parcel located on Ladd Canyon Road in

14   Silverado, California (the "LADD Property").

15       9.        CCRC is informed that Reinhart, since filing bankruptcy, has segregated, and

16   accounted for, all rents collected at the Property.  As of February 14, 2011, Reinhart had turned

17   over to CCRC $53,040.35 in rents collected by him at the Property, and his most recent monthly

18   operating report [Docket No. 124] indicates that there currently is less than $1,100 in cash

19   collateral being held by the Debtor related to the Property.

20       10.       CCRC did not file any objection to Debtor's original or first amended plans and

21   disclosure statements because CCRC believed it had negotiated a consensual resolution of its

22   issues with Reinhart and that the parties merely needed to document that settlement in a

23   stipulation.  No such stipulation was ever signed.

24       11.       CCRC believes Reinhart has similarly overestimated the value of the Property,

25   which he contends is worth $2,000,000, as explained below.  CCRC recently obtained a broker's

26   opinion of value ("BOV") from Edward O'Donnell, Broker's License # 00840738; a true and

27   correct copy of the BOV is attached hereto as Exhibit "B."  Mr. O'Donnell concludes in the BOV

28   that the Property's value is only $790,000.

12.   CCRC calculates that, **as of January 31, 2011**, the total amount owing on the Note is **$588,813.05**, <u>not</u> including attorneys' fees and costs.

13.   CCRC's attorneys' fees and costs in this matter, which are also recoverable under the Note, exceed $50,000 from July 2009 through January 2011.

14.   Thus, as of January 31, 2011, CCRC's total claim was at least $638,813.05 , it has increased since then as a result of attorneys' fees and accrual of additional interest on unpaid amounts, and it will increase as additional interest, attorneys' fees and costs accrue and are incurred in the future.[6]

15.   From the public website of the Orange County Assessor, the property taxes on the Property <u>alone</u> will exceed $100,000 in April 2011, when the next installment of property taxes is due.  Attached as Exhibit "C" is a true and correct copy of that website listing the taxes owing for the Property.

16.   The Debtor proposes that he have the next 20 months – that is more than 1.5 years – until **September 30, 2012**, to sell the Property.  CCRC objects to such an extended period of time.  Debtor has been marketing this portion of the Property for $1.75 million for more than 200 days without any offer, and during any additional time given to Debtor, CCRC has no assurance of adequate protection or interim interest rate payments on the Note, which was due and payable in full and which has been in default since September 2008.

17.   If Debtor is allowed to market the Property for another year and a half, CCRC's claim will increase by unpaid interest, and property taxes will increase if they are not paid. Further, Debtor's proposed application of cash collateral on the Effective Date to principal would lower the amount of interest that CCRC would receive if cash collateral were appropriately applied to interest because interest on a higher principal amount will provide a larger amount than interest on a lower amount. In addition, CCRC will be entitled to any and all additional attorneys'

---

[6]  CCRC believes this calculation is accurate and reserves all rights to seek all interest, fees, charges and other costs that are appropriate.  In particular, much of the work in opposing the DS has been done since January 31, 2011 because CCRC had attempted to negotiate a resolution of these issues but was not successful.  Attorneys' fees through January 31, 2011 are over an 18 month period, and counsel has requested information on these from CCRC's prior counsel, Irell & Manella LLP.

1   fees and costs incurred in this matter. Assuming for the sake of discussion that total attorneys'

2   fees and costs through September 30, 2012 are $70,000 and property taxes will be at least

3   $22,000, CCRC estimates that the amount owing to CCRC on the Note plus property taxes, as of

4   September 30, 2012, would be over **$780,000**.

5       18.   Reinhart has placed the Restaurant parcel of the Property on the market for sale for

6   $1,050,000.

7       I declare under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct and that this Declaration is executed on February 16, 2011, at

9   Las Vegas   [city], Nevada   [state].

10

11                                       James A. Barrett, Jr.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTION OF CRCC FARMS, LLC TO ORIGINAL SECOND AMENDED
DISCLOSURE STATEMENT OF DEBTOR